# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOMINIC HANNA, by and through his guardian ad litem, KATHY HENDERSON,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF FRESNO, et al.,<br><br>Defendants. | 1:14-cv-00142-LJO-SKO<br><br>MEMORANDUM DECISION AND ORDER RE DEFENDANTS' MOTION TO DISMISS (DOC. 41) |

# I. INTRODUCTION

Dominic Hanna, by and through his guardian ad litem, Kathy Henderson ("Plaintiff"), brings this case against Defendants[1] for their alleged violation of his constitutional rights. Doc. 39, Third Amended Complaint ("the TAC"), at 1. Currently before the Court is Defendants' motion to dismiss[2] the TAC in its entirety under Fed. R. Civ. P. 12(b)(6) on the ground it fails to state a claim for relief against Defendants. Doc. 41 at 2. The Court has reviewed the papers and determined that the matter is suitable for decision without oral argument pursuant to Local Rule 230(g). For the reasons discussed below, the Court GRANTS IN PART and DENIES IN PART Defendants' motion.

---

[1] Defendants are the County of Fresno; Margaret Mims, individually and in her official capacity as Sheriff of the County of Fresno; Edward Moreno, M.D., individually and in his official capacity as Director of the Fresno County Department of Public Health; Pratap Narayen, M.D., individually and in his official capacity as the Medical Director of the Division of Correctional Health of the Fresno County Department of Public Health; Karen Nunez, individually and in her official capacity as Nursing Services Manager of the Division of Correctional Health of the Fresno County Department of Public Health; Rick Hill, individually and in his official capacity as Captain of Detention in the Fresno County Adult Detention Facilities; Marilynn Weldon, individually and in her official capacity as the Captain of Inmate Programs and Contracts; Tricia Nekola, individually and in her official capacity as a Licensed Vocational Nurse II at the Fresno County Jail; Blanca Chavez, individually and in her official capacity as a Licensed Mental Health Clinician at the Fresno County Jail.

[2] All of the Defendants except Defendant Blanca Chavez move to dismiss the TAC. See Doc. 42 at 6. For clarity, the Court will refer to the moving Defendants collectively as "Defendants."

## II. FACTUAL BACKGROUND[3]

Plaintiff was at all relevant times a pre-trial detainee at the Fresno County Adult Detention Facility ("the jail") in Fresno, California. TAC ¶ 4. Plaintiff brings this case under 42 U.S.C. § 1983 ("§ 1983") on the ground the County of Fresno ("the County") and various County employees involved in his detention violated his constitutional rights. *Id.* ¶ 2. Specifically, Plaintiff alleges that Defendants' actions "were a direct and legal cause of the permanent mental and physical injuries which result in Plaintiff's physical and mental incapacity" in violation of his constitutional rights. *Id.* ¶¶ 2, 4.

Plaintiff names the County, eight individuals, and Does 1-through 50, inclusive, as Defendants. Plaintiff alleges that Defendant Sheriff Margaret Mims "is ultimately responsible for the health care and safety of prisoners in the jail, but she has failed to meet this responsibility." *Id.* ¶ 7. Defendant "Edward Moreno, Director of the Department of Public Health, is responsible for the provision of health care services including mental health care to all prisoners in the jail." *Id.* ¶ 9. "His responsibilities include, but are not limited to, approving all policies and procedures for the delivery of health care in the Jail." *Id.* Defendant "Pratap Narayen, the Medical Director of the Division of Correctional Health in the Fresno County Department of Public Health, was at all times responsible for the delivery of health care services to all prisoners in the Jail, including mental health care." *Id.* ¶ 10. Defendant "Karen Nunez, Nursing Services Manager of the Division of Correctional Health in the Fresno County Department of Public Health, is and . . . was responsible for supervising the operation and administration of health care services in the Jail, including mental health care." *Id.* ¶ 11. Defendant "Rick Hill, the Captain of Detention in the Jail, is and . . . herein was responsible for custody operations, prisoner classification, correctional officer training, security emergency response, and prisoner grievances." *Id.* ¶ 12. Defendant "Marilynn Weldon, Captain of Inmate Programs and Contracts, is and . . . was responsible for oversight of the contract with the Department of Public Health for the delivery of health care in the Jail." *Id.* ¶ 13. Defendant "Tricia Nekola, was . . . a Licensed Vocational Nurse II, at the Jail." *Id.* ¶ 14. Plaintiff sues all

---

[3] These background facts are drawn exclusively from the SAC, the truth of which must be assumed for purposes of a Rule 12(b)(6) motion to dismiss.

individually named Defendants in their official and individual capacities.[4]

The Doe Defendants "include Jail Psychiatric Services staff, from February 6, 2012 through February 9, 2012, Fresno County employees, employees of Fresno County Department of Public Health, administrators and other personnel." *Id.* ¶ 16. Plaintiffs allege Doe Defendant 21, the main jail Lieutenant ("the Doe Lieutenant Defendant"), is the individual "who approved the removal of [P]laintiff . . . from the Main Jail Suicide Cell, February 8, 2012 at 3:30 a.m." *Id.* ¶¶ 14.

Plaintiff was booked into the jail around 9:30 P.M. on February 6, 2012. *Id.* ¶ 26. Plaintiff was noted to suffer from "a bipolar disorder, for which he required medications, treatment and periods of hospitalization for suicidal ideation, severe depression, and psychosis." *Id.* ¶ 25. Plaintiff "had previously been incarcerated both in Kings County, 2011, and Fresno County, 2009," and "his custodial and medical records were replete with information regarding his severe and debilitating mental health problems, and suicide attempts." *Id.* "A release of information was signed and faxed to the pharmacy at Target in Hanford . . . regarding the medications, Lamictal, [P]laintiff . . . had been prescribed, and had brought with him to the Jail." *Id.* ¶ 26. Plaintiff alleges that "[a] suicide and mental health assessment was completed by intake staff without qualifications or licensure to do so." *Id.*

Information in Plaintiff's "'BMED booking Sheet' . . . listed Lamictal as one of [P]laintiff's prescription medication" and "was attached to [his] 'chart' and placed in Jail Psychiatric Services 'Unverified BMed Bucket.'" *Id.* ¶ 27. The BMED booking sheet "was 'Received' by Jail Psychiatric Services on February 7, 2012." *Id.* Plaintiff "was never provided Lamictal or any other similar medication" while housed in the jail. *Id.*

Plaintiff "was housed at the South Annex Jail [("SAJ")], third floor ("AJ3"), as a pre-trial detainee." *Id.* ¶ 28. The SAJ "was built in 1947 and is the oldest facility in the jail." *Id.* "According to a Fresno County Jail Needs Assessment and Master Plan, dated September 24, 2008, 'this facility is no

---

[4] As noted, Plaintiff also names Blanca Chavez as a Defendant. *See supra* n. 2; *see also* TAC ¶ 55. Plaintiff only mentions Defendant Chavez once in the TAC and provides no facts concerning who she is and how she is responsible for Plaintiff's alleged injuries. *See* TAC ¶ 55. But because the caption of the TAC does not list Blanca Chavez as a Defendant, *see* TAC at 1-2, it is unclear whether Plaintiff asserts his claims against her or whether the reference to her in paragraph 55 of the TAC is a typographical error.

longer functional for the housing of inmates.'" *Id.* The "conditions in the [SAJ] make it extremely difficult for officers to timely observe, prevent and respond to emergencies, and to transport injured prisoners." *Id.* ¶ 30. A 2006 report from the U.S. Department of Justice ("the DOJ Report") found that "construction design and crowing . . . created a risk of harm to prisoners." *Id.* ¶ 31. Specifically, its "visibility problems, the antiquated door control systems, and the small doorframes" created a risk of harm to prisoners. The DOJ Report further found that the "obsolete 'linear type' construction" of the SAJ is "very staff intensive and unsafe." *Id.*

On February 7, 2012, Plaintiff "repeatedly pounded the back of his head against the bars of his cell," which caused "a hematoma the size of a tennis ball on the back of his head." *Id.* ¶ 32. Plaintiff was observed by "B. Welch" regarding the incident, who found that Plaintiff had suffered "trauma—Self inflicted." *Id.* Plaintiff "was provided 800mg of ibuprofen" and "was evaluated by [Jail Psychiatric Services] and placed in [a suicide cell]." *Id.*

Later that day, Defendant Thayin Vu noted that he "responded to a call from [a correctional officer] on AJ3 stating that [an inmate] fell of his bunk." *Id.* ¶ 33. The correctional officer told Vu that Plaintiff "does not want to go to trial [because] he wants to end it." *Id.* The correctional officer further relayed

that custody staff saw [Plaintiff] take something out??? of his mouth or throat that looked like socks, as if he had been trying to gag or choke himself with the socks. Custody staff had also seen plaintiff write a letter he chewed up leaving a portion of the letter with the word "final" on it.

*Id.* Defendant Vu "assessed [P]laintiff's mental health status while he was in a holding cell on the second floor of the Main Jail." *Id.* Defendant Vu knew that Plaintiff stated orally and in writing that he wanted to end his life, "and had used his own socks in an attempt to assure asphyxiation and had flung himself against the hard surfaces of his cell in order to lose consciousness." *Id.* ¶ 42. Plaintiff denied wanting to hurt himself or wanting to commit suicide. *Id.* Defendant Vu noted that Plaintiff "appeared evasive in answering questions and presented as if nothing had happened." *Id.* ¶ 33. "[D]espite [P]laintiff's denial that he wanted to hurt himself or wanted to commit suicide," Defendant Vu

4

determined that "[P]laintiff was a danger to himself." *Id.* "Plaintiff was placed into a suicide cell in the Main Jail for his own safety." *Id.*

At approximately 3:30 A.M. on February 8, 2012, Defendant Nekola "determined that [P]laintiff . . . no longer met suicide cell criteria and recommended that he be removed." *Id.* ¶ 34. "The [Doe] Lieutenant [Defendant] agreed. Jail Psychiatric Services was to follow up 'if scheduled' and as needed for crisis. Plaintiff . . . was returned to AJ3." *Id.*

Plaintiff was arraigned around 1:30 P.M. on February 8, 2012. *Id.* ¶ 35. Defendant Vu assessed Plaintiff around 8:41 P.M. the same day. *Id.* Plaintiff told Defendant Vu that he was "alright" and that he had no suicidal ideation. *Id.* Plaintiff further stated that "he had taken Lamictal previously when he was incarcerated in the Kings County Jail from February 2011 until January 19, 2012, or 20 days before he was booked in Fresno County Jail." *Id.* Defendant Vu knew that Plaintiff "was still without his prescribed or other medication." *Id.* ¶ 42. Defendant Vu determined that Plaintiff "was not a danger to himself," and "[a] release for [Plaintiff's] Kings County Jail records was obtained." *Id.* ¶ 35. Plaintiff "was allowed to remain in his cell on AJ3 with access to socks, a top bunk, but no prescribed or other psychiatric medication, and no mental health follow up." *Id.* ¶ 36.

Around 2:30 P.M. on February 9, 2012, Plaintiff attempted to commit suicide by stuffing two socks down his throat and ramming his head into the cell wall. *Id.* ¶ 37. Medical personnel did not arrive for two to three minutes, during which Plaintiff was unresponsive. *Id.* "CPR was administered for seven minutes before spontaneous circulation began." *Id.* Plaintiff was then "transported by ambulance to Community Regional Medical Center emergency where he was intubated," during which medical personnel removed a sock from his throat. *Id.* "As a result of this suicide attempt," Plaintiff suffered severe physical and mental injuries. *Id.* ¶ 38.

Plaintiff claims that he never received his Lamictal "or any other similar medication" from the time he was booked until his attempted suicide. *Id.* ¶ 26. Plaintiff alleges that

Defendants had in place a policy implemented for the purpose of eliminating the provision of psychiatric prescription medications to inmates with known mental health diagnoses, and/or with current psychiatric medication prescriptions. Defendants knew that this policy placed mental

health patients at risk of harm, yet [D]efendants deliberately enforced this policy during [Plaintiff's] detention at the Fresno County Jail.

*Id.* ¶ 39. Plaintiff asserts that Defendants followed this policy despite Plaintiff's "history of mental illness . . . the prescription medications he had brought with him to the jail, and . . . [his] two serious suicide attempts and explicit statements of an intent to commit suicide all within the first 24 hours of his detention." *Id.* ¶ 40.

Plaintiff alleges that neither Defendant Nekola nor the Doe Lieutenant Defendant, both under the supervision of Defendant Hall, "had [the] expertise, training, or qualifications to conduct a mental health assessment of [Plaintiff], nor were they qualified to determine whether [Plaintiff] was no longer a danger to himself." *Id.* ¶ 41. Plaintiff further alleges that Defendant Nekola and the Doe Lieutenant Defendant "released [Plaintiff] from the suicide cell, and returned him to his regular cell in AJ3, without consulting a psychiatrist or other qualified personnel." *Id.* Plaintiff asserts that Defendants "knowingly placing [Plaintiff] at risk of harm" because "[t]hese actions were done with the [D]efendants' knowledge that they did not have the expertise or qualification to properly assess [Plaintiff's] mental status." *Id.*

Plaintiff argues that "[t]he supervisory [D]efendants' deliberate policy of permitting unqualified and untrained personnel to make assessments and decisions regarding the custody and treatment of detainees with serious mental illness" demonstrates that those Defendants "knowingly denied, delayed and interfered with the adequate medical needs of such inmates, including [Plaintiff]." *Id.*

### III. **PROCEDURAL BACKGROUND**

Plaintiff filed this suit on February 3, 2014. Doc. 2. Plaintiff filed a first amended complaint on May 8, 2014 (Doc. 20) and a second amended complaint ("the SAC") on May 20, 2014. Doc. 21. In the SAC, Plaintiff alleged claims against Defendants under § 1983 for (1) denial of his rights under the Eighth and Fourteenth Amendment based on Defendants' deliberate indifference to his mental health needs; (2) for Defendants' failure to train, supervise, and discipline employees; and (3) *Monell*[5] liability.

---

[5] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

1    *Id.* at 12-19.

2            Defendants moved to dismiss the SAC under Fed. R. Civ. P. 12(b)(6) for failure to state a claim.

3    Doc. 29. On July 8, 2014, the Court granted Defendants' motion to dismiss with leave to amend. Doc.

4    38.

5            On July 27, 2014, Plaintiff filed the TAC. Doc. 39. Plaintiff alleges the same three causes of

6    action against Defendants under § 1983 as alleged in the SAC. *See id.* at 15-23. Plaintiff's first cause of

7    action is alleged against all Defendants, his second cause of action is alleged against the Supervisor

8    Defendants only,[6] and his third cause of action is alleged against the County only.

9                                    **IV. <u>STANDARD OF DECISION</u>**

10           A motion to dismiss pursuant to Fed R. Civ. P. 12(b)(6) is a challenge to the sufficiency of the

11   allegations set forth in the complaint. A Fed R. Civ. P. 12(b)(6) dismissal is proper where there is either

12   a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal

13   theory." *Balisteri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). In considering a motion to

14   dismiss for failure to state a claim, the court generally accepts as true the allegations in the complaint,

15   construes the pleading in the light most favorable to the party opposing the motion, and resolves all

16   doubts in the pleader's favor. *Lazy Y. Ranch LTD v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

17           To survive a 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim

18   to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim

19   has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

20   reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S.

21   662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for

22   more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at

23   556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops

24   short of the line between possibility and plausibility for entitlement to relief.'" *Id.* (quoting *Twombly*,

25   _____

26   [6] The Supervisor Defendants are the County, Mims, Moreno, Narayen, Nunez, Hill, Weldon, and Does 1-20. *See* TAC ¶¶ 66-75, 78-80.

1   550 U.S. at 557).

2   "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual

3   allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more

4   than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."

5   *Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Thus, "bare assertions . . . amount[ing]

6   to nothing more than a 'formulaic recitation of the elements' . . . are not entitled to be assumed true."

7   *Iqbal*, 556 U.S. at 681. In practice, "a complaint . . . must contain either direct or inferential allegations

8   respecting all the material elements necessary to sustain recovery under some viable legal theory."

9   *Twombly*, 550 U.S. at 562. To the extent that the pleadings can be cured by the allegation of additional

10  facts, the plaintiff should be afforded leave to amend. *Cook, Perkiss and Liehe, Inc. v. Northern*

11  *California Collection Serv., Inc.*, 911 F.2d 242, 247 (9th Cir. 1990) (citations omitted).

12  # V. DISCUSSION

13  A.   **County Defendants.**[7]

14  As a preliminary matter, Defendants argue that Plaintiff's claims against the County Defendants

15  in their official capacities should be dismissed as redundant because Plaintiff asserts a *Monell* claim

16  against the County. "When both a municipal officer and a local government entity are named, and the

17  officer is named *only* in an official capacity, the court may dismiss the officer as a redundant defendant."

18  *Ctr. for Bio-Ethical Reform, Inc. v. L.A. Cnty. Sheriff Dep't*, 533 F.3d 780, 799 (9th Cir. 2008)

19  (emphasis added) (citing *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991)). Accordingly,

20  Plaintiff's claims against the County Defendants in their official capacities only are DISMISSED

21  WITHOUT LEAVE TO AMEND as redundant. *See Williams v. Las Vegas Metro. Police Dep't*, No. 13-

22  cv-1340-GMN-NJK, 2014 WL 979943, at *2 (D. Nev. Mar. 11, 2014) (dismissing the plaintiff's claims

23  against police officers as "duplicative" of the plaintiff's claims against their police department).

24

25  _____

26  [7] The County Defendants are Defendants Mims, Moreno, Narayan, Nunez, Hill, Weldon, Nekola, and Vu.

B.      **Plaintiff's First Cause of Action.**

Plaintiff's first cause of action is brought under § 1983. Plaintiff alleges that Defendants violated his constitutional rights under the Eighth and Fourteenth Amendments. Specifically, Plaintiff alleges that Defendants exhibited deliberate indifference to his mental health needs during his detention and but for their conduct he would not have sustained the injuries that he did.

      **1.      Deliberate Indifference Standard.**

Because a pretrial detainee has not been convicted of a crime, but has only been arrested, the detainee's right to receive adequate medical care derives from the Due Process Clause of the Fourteenth Amendment rather than from the Eighth Amendment's protection against cruel and unusual punishment. *Gibson v. Cnty. of Washoe, Nevada*, 290 F.3d 1175, 1187 (9th Cir. 2002). Nonetheless, the Due Process Clause imposes, at a minimum, the same duty to provide adequate medical care to those detained as imposed by the Eighth Amendment: "persons in custody have the established right to not have officials remain deliberately indifferent to their serious medical needs." *Id.* at 1187 (internal quotation omitted). Accordingly, courts evaluating a pretrial detention medical needs claim routinely rely on decisions applying the Eighth Amendment standards for claims of inadequate medical care to convicted prisoners. *See, e.g.*, *id.*

> Under the Eighth Amendment's standard of deliberate indifference, a person is liable for denying a prisoner needed medical care only if the person knows of and disregards an excessive risk to inmate health and safety. In order to know of the excessive risk, it is not enough that the person merely be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, he must also draw that inference. If a person should have been aware of the risk, but was not, then the person has not violated the Eighth Amendment, no matter how severe the risk. But if a person is aware of a substantial risk of serious harm, a person may be liable for neglecting a prisoner's serious medical needs on the basis of either his action or his inaction.

*Id.* at 1187-88 (internal citations omitted).

"Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Indifference to "medical needs must be substantial. Mere indifference, negligence, or medical malpractice will not support this cause of action." *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980). "Isolated occurrences of neglect" do not rise to the level of an Eighth Amendment

violation. *O'Loughlin v. Doe*, 920 F.2d 614, 617 (9th Cir. 1990).

Deliberate indifference requires the plaintiff to show (1) "a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain," and (2) "the defendant's response to the need was deliberately indifferent." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal quotations omitted). Deliberate indifference is shown by "a purposeful act or failure to respond to a prisoner's pain or possible medical need, and harm caused by the indifference." *Id*. Deliberate indifference may be manifested when officials "deny, delay or intentionally interfere with medical treatment." *Id*.

Accordingly, to establish that the defendant acted with deliberate indifference to the plaintiff's serious medical need, the plaintiff must show that the defendant was "(a) *subjectively aware* of the serious medical need and (b) failed adequately to respond." *Conn v. City of Reno*, 591 F.3d 1081, 1096 (9th Cir. 2010) (citing *Farmer*, 511 U.S. at 828) (emphasis in original), *vacated*, 131 S.Ct. 1812 (2011), *reinstated in relevant part*, 658 F.3d 897 (2011). Further, the plaintiff must show "harm caused by the indifference." *Jett*, 439 F.3d at 1096 (citing *McGuckin v. Smith*, 974 F.2d at 1060). "But if a person is aware of a substantial risk of serious harm, a person may be liable for neglecting a prisoner's serious medical needs on the basis of either his action or his inaction." *Gibson*, 290 F.3d at 1188 (citing *Farmer*, 511 U.S. at 842). A plaintiff "need not show that a prison official acted or failed to act believing that harm actually would befall on inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842; *see also Lolli v. Cnty. of Orange*, 351 F.3d 410, 420 (9th Cir. 2003) ("To have acted with deliberate indifference . . . the officers also must have inferred . . . that [the plaintiff] was at serious risk of harm" if he did not receive immediate medical attention).

10

**2.** **Whether Defendants Were Deliberately Indifferent to Plaintiff's Serious Medical Needs.[8]**

"A person deprives another of a constitutional right within the meaning of Section 1983 if he [or she] does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that *causes* the deprivation of which [the plaintiff complains]." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988) (quoting *Johnson v. Duffy*, 588 F.2d 40, 743 (9th Cir.1978)) (emphasis added). Accordingly, when a plaintiff seeks damages against individual prison employees, the plaintiff "must plead facts specific to each individual defendant which plausibly suggest that the individual defendant acted with deliberate indifference." *Santana v. Dayalan*, No. 09-cv-3226-LHK, 2011 WL 940234, at *4 (N.D. Cal. Feb. 21, 2011) (citing *Leer*, 844 F.2d at 633-34). "In other words, to state a claim for relief under section 1983, Plaintiff must link each named defendant with some affirmative act or omission that demonstrates a violation of Plaintiff's federal rights." *Perez v. Fresno Police Dep't*, No. 1:14-cv-1699-AWI-SAB, 2014 WL 5781128, at *2 (E.D. Cal. Nov. 5, 2014). "In determining whether Plaintiff has met this standard, the court must 'scrutinize the particular facts and look for substantial indifference in the individual case, indicating more than mere negligence or isolated occurrences of neglect.'" *Santana*, 2011 WL 940234, at *4 (quoting *Housewright*, 900 F.2d at 1334).

**a.** **Defendant Vu.**

Plaintiff alleges that Defendant Vu "was responsible for the suicide risk assessment which preceded [P]laintiff's . . . suicide [attempt] and resulted in [his] injuries." TAC ¶ 15. On February 7, 2012, Defendant Vu assessed Plaintiff after he had been observed "pound[ing] the back of his head against the bars of his cell," which "caused a hematoma the size of a tennis ball on the back of his head." *Id.* ¶ 32-33. Defendant Vu had "responded to a call from [a correctional officer] on AJ3 stating that [an inmate] fell of his bunk," and had been observed "tak[ing] something out of his mouth or throat that looked like socks, as if he had been trying to gag or choke himself." *Id.* ¶ 33. "Defendant Vu, despite

---

[8] Defendants do not—and cannot—dispute that Plaintiff had a serious medical need at all relevant times. As the Ninth Circuit holds, "[a] heightened suicide risk or an attempted suicide is a serious medical need." *Conn*, 591 F.3d at 1095; *see also Simmons*, 609 F.3d at 1018 (same). Accordingly, the Court must address only Plaintiff's allegations that Defendants acted with deliberate indifferent to his serious medical needs.

11

[P]laintiff's denial that he wanted to hurt himself or wanted to commit suicide, determined that [P]laintiff was a danger to himself." *Id.* "Plaintiff was placed into a suicide cell in the Mail Jail for his own safety" pursuant to Defendant Vu's assessment. *Id.*[9] Accordingly, Plaintiff does not argue that Defendant Vu treated Plaintiff with deliberate indifference up to February 7, 2012. *See* TAC ¶ 42; Doc. 49 at 19.

Plaintiff does argue, however, that Defendant Vu acted with deliberate indifferent to his serious medical needs on February 8, 2012. *See* TAC ¶ 42; Doc. 49 at 20. Defendant Vu assessed Plaintiff approximately seven hours after he was arraigned on February 8, 2012. TAC ¶ 35. Plaintiff "indicated he was 'alright' and had said he had no suicidal ideation." *Id.* Plaintiff also informed Defendant Vu that he had taken Lamictal "when he was incarcerated in the Kings County Jail from February 2011 until January 19, 2012, or 20 days before he was booked in [the jail]." *Id.* "A release for the Kings County Jail records was obtained." *Id.* Defendant Vu determined that Plaintiff "was not a danger to himself." *Id.*

Defendant Vu knew that Plaintiff had attempted suicide twice the day prior while housed in AJ3 "and that AJ3 was inadequate housing for [Plaintiff] because it lacked proper staffing and ability to observe and respond to self-destructive behavior." *Id.* ¶ 42. Because Defendant Vu found that Plaintiff was a danger to himself, he was placed in a suicide cell for his safety. *Id.* ¶¶ 33. Defendant Vu further knew that Plaintiff "was still without his prescribed [medication] or other medication," *id.*, yet "failed to provide needed medications." *Id.* ¶ 49. Defendant Vu "found [Plaintiff] was no longer a danger to himself." *Id.* Plaintiff "was allowed to remain in his cell on AJ3 with access to socks, a top bunk, but no prescribed or other psychiatric medication, and no mental health follow up." *Id.* ¶ 36. The next day, Plaintiff "attempted suicide by stuffing two socks down his throat, and ramming his head into a cell wall." *Id.* ¶ 37. Plaintiff asserts that because Defendant Vu knew the "surrounding facts of [Plaintiff's] mental state and his very recent self-inflicted injurious conduct," Defendant Vu's February 8, 2012

---

[9] Although Plaintiff does not explicitly allege that "Plaintiff was placed into a suicide cell in the Mail Jail for his own safety" pursuant to Defendant Vu's assessment, that is the logical conclusion to draw from Plaintiff's allegations. Moreover, Plaintiff argues in his opposition that he "was a danger to himself on the evening of February 7, 2012, when [Defendant] Vu had [Plaintiff] placed in a security cell." Doc. 46 at 19.

1  assessment of Plaintiff "constituted a purposeful act or failure to respond to an excessive risk to

2  [Plaintiff's] health and safety," as well as "a willful denial, delay and interference with [Plaintiff's]

3  adequate psychiatric treatment." *Id.* ¶ 42.

4        At this stage in the litigation, the Court must accept as true Plaintiff's allegations. The Court

5  finds that Plaintiff has alleged sufficient facts to support a finding that Defendant Vu acted with

6  deliberate indifference to Plaintiff's serious medical needs. Specifically, Defendant Vu's conduct on

7  February 8, 2012, supports such a finding. Defendant Vu assessed Plaintiff on February 8, 2012,

8  approximately one day after Plaintiff had twice attempted to commit suicide, after which Defendant Vu

9  determined that Plaintiff posed a danger to himself and was placed into a suicide cell for his own safety.

10  Defendant Vu knew that Plaintiff had not received his prescribed medication or any other medication.

11  The next day, Defendant Vu determined that Plaintiff posed no threat to himself, and made no

12  recommendation for precautionary measures. Plaintiff was thereafter housed in AJ3, which Defendant

13  Vu knew "was inadequate" to ensure Plaintiff's safety at the time. Plaintiff's allegations, assumed as

14  true, plausibly demonstrate "that the course of treatment [Defendant Vu] chose was medically

15  unacceptable under the circumstances . . . and . . . that [he] chose this course in conscious disregard of an

16  excessive risk to plaintiff's health." *See Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1986) (citations

17  omitted).

18        Plaintiff did not attempt to commit suicide while housed in a suicide cell for his safety on

19  February 7, 2012, but twice attempted to do so while housed in his cell in AJ3 the next day. Plaintiff's

20  allegations therefore plausibly demonstrate that Plaintiff would not have attempted suicide if Defendant

21  Vu had not disregarded the risk posed to Plaintiff's health and had Plaintiff housed in a suicide cell.

22  Accordingly, the Court DENIES Defendants' motion to dismiss Plaintiff's first cause of action as

23  alleged against Defendant Vu.

24        **b.**    **Defendant Nekola.**

25        Plaintiff's allegations concerning Defendant Nekola's involvement in Plaintiff's care while at the

26  jail are limited. Plaintiff alleges that at 3:30 A.M. on February 8, 2012, Defendant Nekola "determined

that [Plaintiff] no longer met suicide cell criteria and recommended that he be removed." TAC ¶ 34. The Doe Lieutenant Defendant "approved the removal of [Plaintiff] from the [suicide cell]." *Id.* ¶ 14. Plaintiff alleges that Defendant Nekola did not have the "expertise, training, or qualifications to conduct a mental health assessment of [Plaintiff], nor [was she] qualified to determine whether [Plaintiff] was no longer a danger to himself." *Id.* ¶ 41. Plaintiff alleges that Defendant Nekola recommended that Plaintiff be released from the suicide cell and returned to his regular cell in AJ3 without consulting a psychiatrist or other qualified personnel. *Id.* Plaintiff further alleges that Defendant Nekola made this unsupervised determination with the knowledge that she "did not have the expertise or qualification to properly assess [Plaintiff's] mental status and thus [she] knowingly placed [Plaintiff] at risk of harm." *Id.* ¶¶ 41, 56.

As Plaintiff alleges, Defendant Nekola recommended that Plaintiff be released from the suicide cell. *Id.* ¶ 34. The Doe Lieutenant Defendant agreed, *id.*, and "approved the removal of" Plaintiff from the suicide cell. *Id.* ¶ 14. Defendant Nekola did not make the decision to release Plaintiff from the suicide cell; the Doe Lieutenant Defendant did. Nonetheless, according to Plaintiff's allegations, had Defendant Nekola not made the recommendation, the Doe Lieutenant Defendant necessarily would not have adopted it. Thus, Plaintiff's allegations against Defendant Nekola plausibly demonstrate that her recommendation "set in motion" a series of acts—Plaintiff's removal from the suicide cell and placement in AJ3—that caused Plaintiff's constitutional injuries. *See Conn*, 591 F.3d at 1098 (quoting *Duffy*, 588 F.2d at 743-44). Accordingly, the Court DENIES Defendants' motion to dismiss as to Defendant Nekola.

### c.    The Supervisor Defendants.[10]

Plaintiff also alleges his first cause of action against the Supervisor Defendants.[11] Plaintiff does not allege that the Jail Supervisor Defendants were directly involved with or participated in Plaintiff's detention or the health care he received at the jail. Rather, Plaintiff alleges that the Jail Supervisor

---

[10] The Supervisor Defendants are Defendants Mims, Moreno, Narayan, Nunez, Hill, Weldon, and Does 1-20.

[11] To the extent Plaintiff's claim is against the County, it is properly brought as a *Monell* claim. *See supra* Section V.A.

1   Defendants ultimately were responsible for the operation and policies of the jail, including its delivery of

2   health care to inmates and detainees, and are therefore liable for the violation of his constitutional rights

3   committed by the jail staff under their supervision. *See, e.g.*, TAC ¶¶ 7, 12, 20-24.

4       The Ninth Circuit explained the applicable principles of supervisory liability as follows:

5       A defendant may be held liable as a supervisor under § 1983 "if there exists either (1) his or
        her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection

6       between the supervisor's wrongful conduct and the constitutional violation." *Hansen v. Black*,
        885 F.2d 642, 646 (9th Cir. 1989) . . . .

7

8       "The requisite causal connection can be established . . . by setting in motion a series of acts
        by others" . . . or by "knowingly refus[ing] to terminate a series of acts by others, which [the
        supervisor] knew or reasonably should have known would cause others to inflict a constitutional

9       injury." *Dubner v. City & Cnty. of San Francisco*, 266 F.3d 959, 968 (9th Cir. 2001). "A
        supervisor can be liable in his individual capacity for his own culpable action or inaction in the

10      training, supervision, or control of his subordinates; for his acquiescence in the constitutional
        deprivation; or for conduct that showed a reckless or callous indifference to the rights of others."

11      *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998) (internal alteration and
        quotation marks omitted) . . . . We have held that "acquiescence or culpable indifference" may

12      suffice to show that a supervisor "personally played a role in the alleged constitutional
        violations." *Menotti v. City of Seattle*, 409 F.3d 1113, 1149 (9th Cir. 2005); *see Redman*, 942

13      F.2d at 1446 . . . [W]here the applicable constitutional standard is deliberate indifference, a
        plaintiff may state a claim for supervisory liability based upon the supervisor's knowledge of and

14      acquiescence in unconstitutional conduct by others.

15  *Starr v. Baca*, 652 F.3d 1202, 1207-08, 1221 (9th Cir. 2011). A supervisor therefore may be liable for

16  constitutional violations of subordinates for "implement[ing] a policy so deficient that the policy 'itself

17  is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'"

18  *Hansen v. Black*, 884 F.2d 642, 646 (9th Cir. 1989) (citation omitted).

19      The TAC contains no allegations that suggest that the Supervisor Defendants participated in or

20  were directly involved with the underlying events. Nor is there any allegation that suggests the

21  Supervisor Defendants knew of Plaintiff's medical history and course of treatment at the jail or were in a

22  position to prevent personally his suicide attempts. Plaintiff asserts, however, that the jail's policies and

23  procedures violated his constitutional rights because those "policies and practices . . . subjected

24  [Plaintiff] to an unreasonable risk of harm and injury from inadequate health care and violence." TAC ¶

25  47. Plaintiff asserts that the Supervisor Defendants, as the individuals in charge of the jail's policies and

26  procedures, are liable to Plaintiff for the violations of his constitutional rights that those policies and

procedures caused. *Id.*

Specifically, Plaintiff alleges that the Supervisor Defendants knowingly: (1) implemented an ineffective and inadequate mental health care intake and screening process; (2) implemented an ineffective and inadequate mental health care delivery system; (3) implemented a policy that led to delayed or denied access to medical care and medication; (4) employed under-qualified mental health care staff; (5) understaffed and underfunded health care positions; (6) used unsupervised, unqualified, and unlicensed "entry-level health care providers" to perform mental health evaluations and assessments; and (7) housed inmates in AJ3, which lacked proper staff and has known construction flaws that render it unsafe for inmates, particularly those with mental illnesses, such as Plaintiff. *See generally* TAC ¶¶ 52-64.

According to Plaintiff, the Supervisor Defendants knowingly implemented (or at least acquiesced to) a series of specific policies relating to his healthcare from intake through release to his cell, where he thrice attempted suicide in less than 72 hours. Among other things, Plaintiff alleges that pursuant to the Supervisor Defendant's jail policies he (1) was not screened effectively for his mental health, (2) was denied his necessary psychotropic medication, (3) received substandard medical care from individuals not properly trained to assess his mental health needs, and (4) was housed in a facility that was unsafe given his mental health needs. Defendants do not dispute that the Supervisor Defendants had control over these policies. Defendants argue, however, that Plaintiff's allegations are insufficient to support a finding that the Supervisor Defendants were deliberately indifferent to Plaintiff's serious medical needs. *See generally* Doc. 42 at 17-19; Doc. 47 at 5.

At this point, the Court is not called on to assess the merits of the jail's healthcare policies and procedures. The Court finds that Plaintiff's allegations plausibly demonstrate that the Supervisor Defendants knowingly implemented, or acquiesced to, a series of specific jail healthcare policies that exposed Plaintiff to a substantial risk of serious harm. For pleading purposes, this is sufficient to allege "a purposeful act or failure to respond to a prisoner's pain or possible medical need." *See Redman*, 942 F.3d at 1446-47; *see also Estate of Jessie P. Contreras v. Cnty. of Glenn*, No. 2:09-CV-2468-JAM-EFB,

2010 WL 4983419, at *5 (E.D. Cal. Dec. 2, 2010) ("Thus the Court may infer from the [plaintiff's] allegations . . . that after it was noted in Decedent's file that he was suicidal, Defendant may bear some responsibility for the failure to provide care which led to Decedent's death."); *Van Horn v. Hornbeak*, No. CV F 08-1622-LJO-DLB, 2009 WL 435104, at *7 ("a policy not to address a serious medical need constitutes a constitutional deprivation"). Accordingly, Defendants' motion to dismiss Plaintiff's first cause of action as alleged against the Supervisor Defendants is DENIED.

### C.   **Plaintiff's Second Cause of Action.**

Plaintiff alleges his second cause of action, titled "Violation of 42 U.S.C. § 1983 Failure to Train, Supervise and Discipline Employees," against the County[12] and the Supervisor Defendants. TAC ¶ 66. Plaintiff asserts that, as a result of the Supervisor Defendants' failure to train, supervise, and discipline employees under their supervision, Plaintiff "was not provided adequate or necessary mental health services or adequate medications," which caused Plaintiff's injuries. *Id.* ¶¶ 66, 76.

A supervisor's liability for a subordinate's unconstitutional conduct turns on whether the supervisor "set in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he knew or reasonably should have known, would cause others to inflict the constitutional injury." *Watkins*, 145 F.3d at 1093 (quoting *Larez v. City of L.A.*, 946 F.2d 630, 645 (9th Cir. 1991). "A supervisor can be liable in his individual capacity 'for his own culpable action or inaction in the training, supervision, or control of his subordinates.'" *Id.* The supervisor's acts or omissions must amount to deliberate indifference to a constitutional right. *See Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2010).

Thus, a supervisor may be liable under § 1983 for failing to train subordinates where the supervisor "was deliberately indifferent to the need to train subordinates, and the lack of training actually caused the constitutional harm or deprivation of rights." *Flores v. Cnty. of L.A.*, 758 F.3d 1154,

---

[12] As noted above, Plaintiff's claims against the County are properly brought as *Monell* claims and are discussed below. To the extent Plaintiff alleges his first and second claims against the County, the Court will assess those claims under the rubric of *Monell* liability.

1159 (9th Cir. 2014) (citing *Connick v. Thompson*, __ U.S. __ 131 S.Ct. 1350, 1358 (2011)). "Under this standard, [a plaintiff] must allege facts to show that [the supervisor] 'disregarded the known or obvious consequence that a particular omission in their training program would cause [municipal] employees to violate citizens' constitutional rights." *Id.* (quoting *Connick*, 131 S.Ct. at 1360).

The thrust of Plaintiff's second cause of action is that the Supervisor Defendants are liable for Plaintiff's constitutional, physical, and mental injuries due to their mismanagement of jail staff. Specifically, Plaintiff asserts that the Supervisor Defendants failed to properly and adequately train or supervise the jail's healthcare staff employed at the time of Plaintiff's detention, and therefore the Supervisor Defendants knew Plaintiff would receive substandard healthcare at the jail. *See* TAC ¶¶ 69-76. Plaintiff argues that the Supervisor Defendants therefore acted with deliberate indifference to his medical needs in their failure to train, supervise, and discipline their subordinates.

In general, "[a] 'pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train,' though there exists a 'narrow range of circumstances [in which] a pattern of similar violations might not be necessary to show deliberate indifference.'" *Id.* (quoting *Connick*, 131 S.Ct. at 1360-61). In this "narrow range of circumstances," a single incident may suffice to establish deliberate indifference where the violation of constitutional rights is a "highly predictable consequence" of a failure to train because that failure to train is "so patently obvious." *Connick*, 131 S.Ct. at 1361 (discussing *City of Canton, OH v. Harris*, 489 U.S. 378 (1989)). "These 'circumstances' generally involve incidents arising from a total lack of training, not simply an assertion that a municipal employee was not trained about 'the specific scenario related to the violation.'" *Williams v. Cnty. of Alameda*, __ F. Supp. 2d __, 2014 WL 556008, at *11 (N.D. Cal. Feb. 10, 2014) (quoting *Connick*, 131 S.Ct. at 1363); *see Dillman v. Tuolumne Cnty.*, No. 1:13-cv-404-LJO-SKO, 2013 WL 3832736, at *7 (E.D. Cal. July 23, 2013) (dismissing complaint for failure "to allege a *complete* lack of training with reference to [the contested municipal policies]"); *Dillman v. Tuolumne Cnty.*, No. 1:13-cv-404-LJO-SKO, 2013 WL 1907379, at *17 (E.D. Cal. May 7, 2013) (dismissing complaint for failure to allege "that employees received *no* training on [the contested

1  municipal policy]").[13]

2       Because the TAC does not allege that Plaintiff's injuries are part of a "pattern of constitutional

3  violations" at the jail, Plaintiff must proceed on a single incident theory. The TAC does not allege that

4  the Supervisor Defendants failed to provide their subordinates with any training relevant to Plaintiff's

5  healthcare. Rather, Plaintiff alleges that the training was not "adequate" or "proper." *See* TAC ¶¶ 23, 52,

6  69-80. However, "prov[ing] that an injury or accident could have been avoided if an [employee] had had

7  better or more training, sufficient to equip him to avoid the particular injury-causing conduct" is

8  insufficient. *Connick*, 131 S.Ct. at 1363-64. "*Connick* requires a showing that defendant 'was on notice

9  that, absent additional specified training, it was 'highly predictable' that relevant employees would

10 violate constitutional rights." *Dillman*, 2013 WL 1907379, at *17 (citing *id.* at 1366). To provide the

11 Supervisor Defendants adequate notice, Plaintiff must do more than make conclusory allegations that

12 they did not "properly" or "adequately" train their subordinates. *Id.* Accordingly, Plaintiff's second

13 cause of action is DISMISSED WITHOUT LEAVE TO AMEND.

14 D.   **Plaintiff's Third Cause of Action.**

15       Plaintiff's third cause of action is a *Monell* claim against the County, acting through the

16 Supervisor Defendants. TAC ¶ 77. Plaintiff alleges that the Supervisor Defendants "developed,

17 implemented, enforced, encouraged and sanctioned de facto policies, practices, and/or customs

18 exhibiting deliberate indifference to [Plaintiff's] constitutional rights which caused the violation of such

19 rights. *Id.* ¶ 78. Specifically, Plaintiff alleges that the County implemented and sanctioned policies that

20 failed

21       (a) to adequately supervise and train its officers and agents, including the Defendants, thereby
        failing to adequately discourage further constitutional violations on the part of its Jail custody
22      and medical health care staff; (b) to properly and adequately monitor and discipline its officers,

23 ─────────────────────────

24 [13] At least one other court has found that deliberate indifference may be established where "particularly egregious
   circumstances" can demonstrate that "the failure to train [municipal employees] was so obviously deficient that it could lead
25 to liability resulting from the single constitutional deprivation at issue here." *Schwartz v. Lassen County ex rel. Lassen
   County Jail (Det. Facility)*, 838 F. Supp. 2d 1045, 1058 (E.D. Cal. 2012) (England, J.) (citing *Connick*, 131 S.Ct. at 1361);
   *Dorger v. City of Napa*, No. 12-cv-440 YGR, 2012 WL 3791447, at *4 (N.D. Cal. Aug. 31, 2012) ("While proving
26 "deliberate indifference" generally requires a showing of such a pattern, particularly egregious circumstances or an obvious
   need for training based upon a single incident may suffice.") (citing *id.*).

1   including Defendants; and (c) to adequately and properly investigate citizen complaints and
reports of the abuses and constitutional deprivations in the Jail, and, instead, said abuses and
2   constitutional violations were tolerated by the County

3   *Id.* ¶ 80.

4        To establish municipal liability under *Monell*, Plaintiff must first establish that a municipal
5   employee deprived him of a constitutional right. *Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). Next,
6   Plaintiff must show that an official city policy, custom, or practice was the moving force behind the
7   constitutional injury. *Monell*, 436 U.S. at 694. A "policy" is a "deliberate choice to follow a course of
8   action . . . made from among various alternatives by the official or officials responsible for establishing
9   final policy with respect to the subject matter in question." *Fogel v. Collins*, 531 F.3d 824, 834 (9th Cir.
10   2008). A "custom" is a "widespread practice that, although not authorized by written law or express
11   municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of
12   law." *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988); *L.A. Police Protective League v. Gates*, 907
13   F.2d 879, 890 (9th Cir. 1990). "Only where a failure to train reflects a 'deliberate' or 'conscious' choice
14   by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under
15   § 1983." *Clouthier*, 591 F.3d at 1250; *see also Flores*, 758 F.3d at 1158-59.

16        The Ninth Circuit employs a two-part test to determine whether a plaintiff has stated a *Monell*
17   claim:

18        First, to be entitled to the presumption of truth, allegations in a complaint or counterclaim may
        not simply recite the elements of a cause of action, but must contain sufficient allegations of
19        underlying facts to give fair notice and to enable the opposing party to defend itself effectively.
        Second, the factual allegations that are taken as true most plausibly suggest an entitlement to
20        relief, such that it is not unfair to require the opposing party to be subjected to the expense of
        discovery and continued litigation.

21   *Starr*, 652 F.3d at 1216; *AE ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012)
22   ("This standard [from *Starr*, which did not concern a *Monell* claim], applies to *Monell* claims").

23        Plaintiff sufficiently states with specificity the contents of the jail's allegedly unconstitutional
24   policies. Among other policies, Plaintiff alleges that the jail had in place at the time of Plaintiff's
25   incarceration policies of (1) delaying or denying inmate's their necessary psychotropic medications; (2)

26

1  knowingly permitting unqualified and unlicensed healthcare professionals to perform mental health

2  assessments; (3) permitted those healthcare professionals, without adequate supervision, to determine

3  whether an inmate should be released from the protection of a suicide cell; and (4) housed inmates in

4  AJ3 in spite of knowing of its posing a safety risk to mentally ill inmates, such as Plaintiff.

5      As the Ninth Circuit explained,

6      In *Cabrales*, which involves municipal rather than individual liability, an inmate made a suicidal
       gesture while in isolation, after which prison officials released him to the general jail population.

7      *Cabrales*, 864 F.2d at 1457. Subsequently, he got into a fight and was subjected to ten days in
       isolation, during which time he committed suicide. *Id.* We held that the County's inadequate

8      provision of psychiatric care was a "moving force" behind the suicide. *Id.* at 1461.

9  *Conn*, 591 F.3d at 1101. Here, Plaintiff likewise alleges that, had he received appropriate mental

10  healthcare, he would not have attempted suicide and thus would not have suffered the injuries that he

11  did. But because of the jail's policies, Plaintiff alleges that he in fact did not receive adequate healthcare

12  from qualified healthcare professionals during his detention, which allowed him to attempt to commit

13  suicide three times in less than 72 hours. Plaintiff's allegations plausibly demonstrate that the jail's

14  policies were the "moving force" behind the violation of Plaintiff's constitutional rights. *See id.* Further,

15  Plaintiff's constitutional claims, which are based largely on the jail's allegedly constitutionally deficient

16  policies, plausibly suggest entitlement to relief. *Id.*; *see also Mateos-Sandoval v. Cnty. of Sonoma*, 942

17  F. Supp. 2d 890, 899 (N.D. Cal. Jan. 31, 2013). Accordingly, to the extent Plaintiff alleges the County is

18  liable under *Monell* for his constitutional injuries caused by the jail's inadequate health policies, the

19  Court finds that Plaintiff states a claim.

20      The Court, however, finds that Plaintiff fails to state a *Monell* claim against the County to the

21  extent the claim is based on the County's failure to train jail employees. The same standard applies to a

22  failure-to-train claim whether alleged against a municipality or against a municipality's employee in his

23  or her individual capacity. *Flores*, 758 F.3d at 1158-59. Because Plaintiff fails to state a claim against

24  the Supervisor Defendants on a failure-to-train theory, Plaintiff also fails to state a claim against the

25  County on that theory. *See id.*

26      Likewise, Plaintiff's claims that the County failed to "discipline its officers" and failed "to

21

adequately and properly investigate citizen complaints and reports of the abuses and constitutional deprivations in the Jail" are conclusory and devoid of any specific factual allegations. The TAC contains no allegations concerning what, if any, discipline of jail officers was warranted, why it was warranted, and why it was inadequate. Similarly, there are no allegations that concern the alleged "citizen complaints" and "reports" of unconstitutional activities at the jail or how, if at all, the jail responded to them. Thus, to the extent Plaintiff's *Monell* claim rests on those allegations, the claim fails. Accordingly, the Court GRANTS WITHOUT LEAVE TO AMEND Defendants' motion to dismiss Plaintiff's *Monell* claim to the extent it relies on (1) a failure-to-train, supervise, and discipline employees theory of liability and (2) allegations that the jail failed to investigate "citizen complaints and reports."

## VI. <u>CONCLUSION AND ORDER</u>

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Defendants' motion to dismiss (Doc. 41). The Court orders that

1. Plaintiff's claims against the County Defendants in their official capacities <u>only</u> are DISMISSED WITHOUT LEAVE TO AMEND.

2. Plaintiff's second cause of action is DISMISSED WITHOUT LEAVE TO AMEND.

3. Plaintiff's third cause of action is DISMISSED IN PART WITHOUT LEAVE TO AMEND.

4. Defendants' motion to dismiss is DENIED in all other respects.

5. Defendants shall file an answer to the TAC's remaining claims and allegations on or before December 10, 2014.

IT IS SO ORDERED.

Dated:   **November 26, 2014**          **/s/ Lawrence J. O'Neill**
                                         UNITED STATES DISTRICT JUDGE

22