# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOMINIC HANNA, | Case No. 1:14-cv-00142-LJO-SKO |
| Plaintiff, | |
| v. | **ORDER GRANTING DEFENDANTS' MOTION FOR RULE 35 EXAMINATION OF PLAINTIFF** |
| FRESNO COUNTY, et al., | **(Doc. 85)** |
| Defendants. | |

## I.   INTRODUCTION

Plaintiff Dominic Hanna ("Plaintiff") filed a Third Amended Complaint ("TAC") on July 27, 2014, that is currently the operative pleading. (Doc. 39.) Plaintiff's TAC states claims against the County of Fresno, Margaret Mims, Edward Moreno, Pratap Narayen, Karen Nunez, Rick Hill, Marilynn Weldon, Tricia Nekola, Thayin Vu, and DOES 1 through 50 (collectively "Defendants") for deprivation of Plaintiff's constitutional rights and their indifference to his medical care resulting in three suicide attempts while housed at Fresno County Jail.  As a result of his final suicide attempt, Plaintiff alleges he suffered anoxic brain damage causing him permanent and severe physical and mental disabilities requiring total care for all his daily needs for the rest of his life. (Doc. 39.)

On October 13, 2015, Defendants filed a motion for a Rule 35 mental examination of Plaintiff. (Doc. 85.) On November 12, 2015, the parties filed a joint report pursuant to Local Rule 251, setting forth their respective positions as to Defendants' request for a Rule 35 examination of Plaintiff. For the reasons set forth below, Defendants' motion for a Rule 35 examination is GRANTED.

## II. BACKGROUND

Plaintiff was booked into Fresno County Jail around 9:30 p.m. on February 6, 2012. It was noted Plaintiff suffered from "a bipolar disorder, for which he required medications, treatments and periods of hospitalization for suicidal ideation, severe depression, and psychosis." Plaintiff "had previously been incarcerated both in Kings County, 2011, and Fresno County, 2009," and "his custodial and medical records were replete with information regarding his severe and debilitating mental health problems, and suicide attempts." (TAC, ¶ 25.) "A release of information was signed and faxed to the pharmacy at Target in Hanford . . . regarding the medications, Lamictal, [P]laintiff . . . had been prescribed, and had brought with him to the Jail." (TAC, ¶ 26.) However, Plaintiff was "never provided Lamictal or any similar medication" while housed in the Jail. (TAC, ¶ 26.)

On February 7, 2012, Plaintiff "repeatedly pounded the back of his head against the bars of his cell," which caused "a hematoma the size of a tennis ball on the back of his head." (TAC, ¶ 32.) After Plaintiff was observed by Jail staff, it was determined that he had suffered from self-inflicted trauma, he was provided 800 mg of ibuprofen, and he was evaluated by Jail psychiatric services and placed in a suicide cell. (TAC, ¶ 32.)

Later that day, Defendant Thayin Vu noted that he "responded to a call from [a correctional officer] on AJ3 stating that [an inmate] fell off his bunk." (TAC, ¶ 33.) The correctional officer told Vu that Plaintiff "does not want to go to trial [because] he wants to end it." (TAC, ¶ 33.) The correctional officer also indicated that custody staff saw Plaintiff taking something out of his mouth that looked like a sock. Vu "assessed [P]laintiff's mental health status while he was in a holding cell on the second floor of the Main Jail." (TAC, ¶ 33.) Plaintiff denied wanting to hurt himself or wanting to commit suicide. (TAC, ¶ 33.) Vu noted Plaintiff "appeared

evasive in answering questions and presented as if nothing had happened." (TAC, 33.) Despite this denial, Vu determined Plaintiff was a danger to himself and he was placed into a suicide cell for his own safety.

At approximately 3:30 a.m. on February 8, 2012, Defendant Nekola "determined that [P]laintiff . . . no longer met suicide cell criteria and recommended that he be removed." (TAC, ¶ 34.) It was agreed that Jail psychiatric services would follow up if scheduled and as needed for a crisis, and Plaintiff was returned to a regular cell.

Plaintiff was arraigned at 1:30 p.m. on February 8, 2012, and Vu assessed Plaintiff at 8:41 p.m. the same day. Plaintiff told Vu that he was "alright" and that he had no suicidal ideation. (TAC, ¶ 34.) Plaintiff also stated that he had taken Lamictal previously when he was incarcerated in the Kings County Jail from February 2011 to January 19, 2012. Plaintiff alleges that Vu knew Plaintiff was still without his prescription or other medication. Vu determined Plaintiff was not a danger to himself, and a release for Plaintiff's Kings County Jail records was obtained. Plaintiff alleges he was allowed to remain in his regular cell with access to socks, a top bunk, but with no prescribed psychiatric medication and no mental health follow up.

At approximately 2:30 p.m. on February 9, 2012, Plaintiff attempted to commit suicide by stuffing two socks down his throat and ramming his head into the cell wall. (TAC, ¶ 37.) Medical personnel did not arrive for two to three minutes, during which time Plaintiff was unresponsive. Plaintiff was transported to Community Regional Medical Center emergency department, where he was treated. As a result, Plaintiff alleges that he suffered severe physical and mental injuries. (TAC, ¶ 38.) Plaintiff alleges that Defendants' deliberate policy of permitting unqualified and untrained personnel to make assessments and decisions regarding the custody and treatment of detainees with serious mental illness demonstrates Defendants knowingly denied, delayed, and interfered with the adequate medical needs of inmates, including Plaintiff. (TAC, ¶ 41.) Plaintiff states claims against Defendants under 42 U.S.C. §1983 for (1) denial of his rights under the Eighth and Fourteenth Amendments based on Defendants' deliberate indifference to his mental health needs; (2) Defendants' failure to train, supervise, and discipline employees; and (3) *Monell* liability. After a second motion to dismiss, Plaintiff's claim for Defendants' failure to train,

supervise, and discipline employees was dismissed; and Plaintiff's third claim under *Monell* was dismissed in part.

After Defendants filed an answer to Plaintiff's TAC, a scheduling conference was held and a litigation schedule under Federal Rule of Civil Procedure 16 was issued.  (Doc. 54.)  The litigation was stayed in February 2015 while competency proceedings regarding Plaintiff were held in Fresno County Superior Court in a separate criminal case.  (Doc. 56.)  In May 2015, the stay of litigation was lifted after the Fresno Superior Court determined Plaintiff was competent to stand trial in his criminal case.  (Doc. 58.)  The parties filed a stipulated request to set new case deadlines, but no modification to the deadline to amend the pleadings was requested, which was set for October 1, 2015.  (Doc. 54.)

On October 13, 2015, Defendants filed this motion for an Independent Medical Examination ("IME") of Plaintiff to determine his current mental status under Federal Rule of Civil Procedure 35, which is currently pending before the Court.  (Doc. 85.)

### III.   DISCUSSION

**A.   Legal Standard**

Rule 35 provides that a court may, for good cause shown, order a physical or mental exam by a "suitably licensed or certified examiner" of a party whose physical or mental condition is "in controversy."  Fed. R. Civ. P. 35.  The party seeking the mental examination must establish both that the proposed examinee's mental health is "in controversy" and that there is "good cause" for the examination.  "Mental and physical examinations are only to be ordered upon a discriminating application by the district judge of the limitations prescribed by the Rule.  To hold otherwise would mean that such examinations could be ordered routinely . . . The plain language of Rule 35 precludes such an untoward result."  *Schlagenhauf v. Holder*, 379 U.S. 104 (1964).  The decision whether to order a Rule 35 examination rests in the sound discretion of the trial court.  *Id*.  Even when the "good cause" and "in controversy" requirements are met, the decision to order a Rule 35 examination still remains a discretionary one.  *Hardy v. Riser*, 309 F. Supp. 1234, 1241 (N.D. Miss. 1970); *Shirsat v. Mutual Pharm Co.*, 169 F.R.D. 68, 70 (E.D. Pa. 1996).  A court must

balance the unnecessary invasion of privacy against the compelling party's right to a fair trial. *Curtis v. Express, Inc.*, 868 F. Supp. 467, 468 (N.D.N.Y. 1994).

"Good cause" under Rule 35 requires more than just showing that the mental health condition is "in controversy." Good cause generally requires a showing of specific facts justifying the examination. *Nava v. City of Shafter*, No. 1:12-cv-00010-AWI-JLT, 2013 WL 5278890, at *1-2 (E.D. Cal. Sept. 18, 2013). The good-cause inquiry generally requires a court to consider such things as whether the information can be obtained through other means and whether the result of the examination would yield information that is relevant. *Schlagenhauf*, 379 U.S. at 118-19. A party's mental condition is "in controversy" when the condition is the subject of the litigation. For example, courts have held that a separate tort claim for emotional distress places the plaintiff's mental condition in controversy. *See Turner v. Imperial Stores*, 161 F.R.D. 89, 95 (S.D. Cal. 1995).

**B.    Analysis**

    **1.    Plaintiff's Mental Condition is In Controversy**

Defendants seek an IME of Plaintiff regarding his mental condition. Plaintiff alleges that his psychiatric problems, including bipolar disorder, require medication. Because he was not provided psychotropic medication in jail, Plaintiff alleges he suffered a "recurrence of suicidality" while detained at Fresno County Jail in February 2012. Plaintiff claims that because he was not provided adequate or necessary mental health services, he attempted suicide and suffered permanent anoxic brain damage and permanent and profound injuries for which he will require 24-hour care for the rest of his life. According to Defendants, experts will opine during the course of the litigation on the nature of Plaintiff's mental condition, which will factor into whether his mental condition was responsible for his suicide attempts. Plaintiff's treating physicians and psychiatrists have rendered opinions on his mental condition when they treated him, and their opinions differ. Defendants expect Plaintiff to call a treating physician to testify as to his mental condition. As such, Defendants maintain Plaintiff's mental health is in controversy under Rule 35.

Plaintiff states he was deemed mentally incompetent by Napa State Hospital physician Michael Coburn, but this evaluation changed "toward the end of 2014" with Dr. Coborn's opinion

and Plaintiff's admission that Plaintiff "had been pretending his mental injuries and memory loss." Plaintiff was then returned to Fresno County in January 2015 and found competent to stand trial on pending criminal charges. Plaintiff maintains that it is now "incumbent upon [him] to strike allegations of memory loss and mental injuries" from the complaint, so that the parties may "focus the litigation on the remaining allegations and not on claims which cannot be substantiated by the evidence." (Doc. 92, 7:21-23.) To that end, Plaintiff has filed a proposed Fourth Amended Complaint as an exhibit to the parties' joint statement. (Doc. 92-1.) Based on the proposed amended complaint, Plaintiff contends the only facts in controversy are whether Defendants were deliberately indifferent to Plaintiff's mental health needs and whether Defendants developed policies or customs that exhibited deliberate indifference to Plaintiff's constitutional rights. Any assessment by Defendants' expert as to Plaintiff's current mental health state sheds no light on the question of liability. Rather, it is Plaintiff's mental condition at the time of his incarceration that is potentially relevant to the question of liability, not his present mental condition.

Defendants respond that even if Plaintiff removes mental damages from his complaint, his mental condition nonetheless remains in controversy. The nature of Plaintiff's existing mental health problems, which Plaintiff alleges were the basis for the care he contends he required but did not receive at the Fresno County Jail at the time of the incident, will factor into causation. Specifically, there is a question whether Plaintiff's mental condition was responsible in whole or in part for his suicide attempts during his detention in February 2012, and this causation issue remains whether or not Plaintiff claims additional mental injury damages as a result of his suicide attempts. Defendants also argue Plaintiff has been able to convince staff and physicians at Napa State Hospital that he had extensive mental injuries and was mentally incompetent as a result of his suicide attempt. Plaintiff's malingering of complaints and his ability to convince mental health staff of his condition at Napa State Hospital pertains to liability and Plaintiff's presentation of his condition in February 2012. During the course of events in February 2012, Plaintiff was observed banging the back of his head on his cell bars and staff saw him remove something from his mouth; he was thereafter placed in a safety cell. Eleven hours later, "he convinced Defendants he was [no] longer a danger to himself," and then he attempted suicide. Plaintiff claims Defendants were

deliberately indifferent to his medical needs, but if Plaintiff can convince Napa State Hospital staff and physicians – who have access to him 24 hours a day – regarding the nature of his condition, Defendants argue he could certainly convince Fresno County Jail staff he no longer intended to harm himself.  This goes directly to Defendants' subjective knowledge of the threat posed by Plaintiff's mental condition.

Plaintiff's mental condition has been placed into controversy because it is the basis for the level and type of care Plaintiff contends Defendants failed to render to him at Fresno County Jail in February 2012.  It has been determined Plaintiff subsequently feigned the nature of his symptoms to his treating physicians at Napa State Hospital, which raises questions about how he presented to Fresno County Jail personnel in February 2012, and whether they had reason to know the extent and nature of his condition and the necessary treatment.  In addition to Plaintiff's admitted malingering to his treating physicians and manufacturing symptoms, his treating and examining physicians are not in agreement regarding the diagnosis and nature of Plaintiff's condition.  Plaintiff's mental condition, its symptom manifestation in February 2012, and the subsequent nature of care he was entitled to receive from medical providers at Fresno County Jail for this condition are disputed facts that are relevant to Defendants' alleged deliberate indifference to his medical needs.  *See Labatad v. Corr. Corp. of Am.*, 714 F.3d 1155, 1160 (9th Cir. 2013) (deliberate indifference has both subjective and objective components).  There is disagreement about the nature of Plaintiff's mental condition, and his symptom presentation in February 2012 is more questionable now given his concession of malingering.  Defendants are entitled to have an independent medical examination of Plaintiff to formulate an opinion about the nature of Plaintiff's mental health condition, the degree to which his symptoms and his presentation of his condition are authentic, and the type of care he should have received in February 2012.

Plaintiff argues his malingering of certain symptoms to treating physicians at Napa State Hospital is entirely irrelevant to his suicide attempt in February 2012. Plaintiff also argues his statement to Fresno County Jail officials that he had no intention to harm himself when he was assessed was not an act of malingering since he had already attempted suicide "and obviously had the intent to do so again, as in fact the next day he did so."  (Doc. 94.)  First, Plaintiff's capacity to

feign symptoms casts doubt on his prior mental health records and evaluations and whether his mental health condition has been accurately characterized. Defendants' expert, therefore, cannot simply rely on prior medical records to formulate an opinion about the nature of Plaintiff's condition, the extent of his symptoms, and the medication Plaintiff was taking and how that would have impacted his condition. Second, Plaintiff's known ability to malinger certain mental health symptoms to treating physicians adds a new dimension to the causation question about whether it was actually Plaintiff's underlying mental condition that led him to attempt suicide and why he told jail personnel that he had no plans to harm himself. Because these are disputed issues in Plaintiff's inadequate medical care claim, Plaintiff's mental condition is in controversy.[1]

That Plaintiff is now disavowing *additional* mental or cognitive impairment as a result of the suicide attempts does not diminish the fact that the nature of Plaintiff's underlying mental condition and how he presented to Defendants during the events in February 2012 is in controversy. For example, police officers accused of excessive force have been ordered to sit for an IME under Rule 35 when they have offered expert reports indicating some facet of their mental or physical functioning impacted their conduct at the time of the alleged underlying events. *Jones v. Prince George's County*, No. 00-2902-RWR-JMF (D.D.C. Oct. 29, 2001); *Estate of Heenan v. City of Madison*, No. 13-cv-00606-WMC, 2015 WL 685870 (W.D. Wis. Feb. 18, 2015). When a party's mental or physical health is relevant in some manner to substantively support their position in the litigation, their mental or physical health has been placed "in controversy." By asserting that his pre-existing mental condition required particular treatment from Fresno County Jail personnel, Plaintiff has placed the nature of his condition, its symptoms, and the required treatment squarely into controversy, regardless of whether or not the alleged failure to render appropriate care caused *additional* mental health or cognitive-function problems. Moreover, there is no evidence presented by the parties – particularly based on Plaintiff's concession of

---

[1] Defendants' motion was taken off calendar and deemed submitted for decision on November 17, 2015. Without obtaining leave to do so, the parties submitted additional briefs. The content of both briefs was information that could have been placed in their joint statement filed pursuant to Local Rule 251. The Court's election to take a motion under submission without oral argument is not an invitation for the parties to submit additional briefing without leave to do so. The parties are cautioned that any future additional briefs filed without leave or good cause will be stricken and disregarded.

malingering – that Plaintiff's underlying mental health (i.e., bipolar disorder) has changed or deteriorated such that a current mental status examination would be irrelevant or unrelated to that condition in February 2012.

### 2. There is Good Cause for An Independent Mental Examination of Plaintiff

Defendants contend they cannot obtain information regarding Plaintiff's mental condition during the course of a deposition or other discovery; rather, a psychiatrist needs to examine Plaintiff to form opinions regarding the nature of his condition and its symptomatology. Plaintiff has been evaluated by many psychiatrists and psychologists since the underlying events in 2012, but Defendants argue they are not required to accept those physicians' evaluations of Plaintiff's condition and his ability to remember and communicate events. Moreover, a review of Plaintiff's prior medical records is not sufficient to inform an expert about Plaintiff's condition. Defendants' expert, Alan A. Abrams, M.D., submitted a declaration indicating that the professional staff at Napa State Hospital determined Plaintiff was malingering at least his account of brain damage. (Doc. 85-3, Abrams Decl., ¶ 6.) According to Dr. Abrams, a psychiatric assessment of Plaintiff's mental state cannot be reliably performed by reviewing records because of Plaintiff's frequent poor cooperation and indications of malingering of mental health symptoms. (Doc. 85-3, Abrams Decl., ¶ 8.)

Plaintiff maintains Defendants cannot justify an IME without first showing that the information could not be obtained during Plaintiff's deposition. Plaintiff cites *Nava v. City of Shafter*, 2013 WL 5278890, where the court ordered a Rule 35 examination of one of the plaintiffs following his deposition. The neurologist who was proposed to perform the IME stated in his declaration that he was unable to ask the necessary follow-up questions during the course of the plaintiff's deposition, and thus the deposition was insufficient to formulate his opinion. The court concluded it was not apparent that the information could be obtained by any other means, and ordered the examination. *Nava* does not stand for the proposition that there is no good cause for an IME until a deposition of the individual proves insufficient. The deposition in *Nava* had already taken place and the neurologist selected for the IME pointed out the obvious: the

9

deposition simply did not allow him to obtain the necessary information in assessing the plaintiff's alleged seizure disorder.

Plaintiff also cites *Azevedo v. City of Fresno*, No. 1:09-cv-0375-AWI-DLB, 2009 WL 5216877 (E.D. Cal. Dec. 30, 2009) and *Kob v. County of Marin*, No. C. 07-2211 JL, 2009 WL 3706820 (N.D. Cal. Nov. 3, 2009) for the proposition that Plaintiff's deposition or other discovery must occur before an IME is ordered. However, neither *Azevedo* nor *Kob* involved a malingering patient, multiple conflicting mental health diagnoses, or sufficient evidence prior to deposition testimony to warrant an IME.

In *Azevedo*, the plaintiff was claiming garden variety mental distress following alleged police excessive force, but he had testified at his deposition that his emotional distress was severe. 2009 WL 5216877, at * 1. The court agreed that, based on his deposition testimony, his emotional distress was beyond the "garden variety" alleged in the complaint, and the additional testimony squarely placed his condition into controversy for purposes of Rule 35. *Id.* at *3. Thus, the plaintiff's deposition testimony gave rise to the need for the mental examination – it was not a required predicate to establishing good cause for the IME.

Similarly, in *Kob v. County of Marin*, No. C. 07-2211 JL, 2009 WL 3706820 (N.D. Cal. Nov. 3, 2009), the plaintiff alleged severe emotional distress and continuing harm. At her deposition, she expounded on the severity of her distress and medical conditions which allegedly resulted from the defendants' conduct. Again, like *Azevedo*, the deposition supplied additional information beyond the complaint that showed how the plaintiffs' conditions were placed in controversy, despite that the plaintiffs had alleged only general garden variety emotional distress in their complaints.

Here, the issues surrounding Plaintiff's mental condition are sufficient to place Plaintiff's condition "in controversy" even in the absence of his deposition, and Dr. Abrams has indicated how prior medical record review would be insufficient to assess Plaintiff under these circumstances. Moreover, it is not clear how a deposition of Plaintiff will narrow the scope of an IME, but it is clear that Dr. Abrams will not be positioned to evaluate Plaintiff by reviewing deposition testimony where questions and follow-up inquiries are posed by lawyers and not a

10

medical expert. As the neurologist noted regarding the plaintiff's deposition testimony in *Nava*, a deposition does not allow a physician or psychologist to formulate follow-up questions. *Nava*, 2013 WL 5278890, at *3. Defendants have made a sufficient showing that an examination is required to obtain the necessary information and have set forth why deposition testimony or other discovery devices will not provide them with the level of information, particularly as to diagnoses and assessment of malingering, that Dr. Abrams will require in formulating his opinion.

As there is evidence that review of Plaintiff's mental health treatment records alone would not be sufficient to render an opinion regarding Plaintiff's mental condition, Plaintiff's deposition will not provide Dr. Abrams with an opportunity to ask follow-up questions and conduct the testing requested, and because the mental examination is likely to reveal relevant information, Defendants' motion is sets forth good cause for an examination. *Schlagenhauf*, 379 U.S. at 118-19.

### 3. Scope and Manner of Examination

The proposed time, place, manner, and conditions of the examination also appear reasonable. Defendants propose that the mental examination be performed by Dr. Abrams, a medical doctor specializing in Psychiatric Medicine. The examination would occur on January 11, 2016, and begin at 9:00 a.m., and would not last longer than 8 hours over a two-day period. The place of the examination is requested to be Plaintiff's hospital room at Golden Cross, unless he is moved prior to the date of examination, and then Defendants request that the examination occur at a facility convenient for Plaintiff. Some psychological testing such as malingering tests and the MMPI-2 will be conducted, but the examination will not be painful. Defendants request that Plaintiff's attorneys not be present at the examination, but Defendants agree to videotape the examination if Plaintiff so wishes. Plaintiff maintains there is no reason to extend the examination beyond 3 hours.

Plaintiff argues the proposed length of examination is too long because of Plaintiff's severe limitations which prevent him from sitting on his own, standing, walking, or completing any bodily function without assistance. However, the parties have already anticipated the need for

11

accommodations of Plaintiff's physical difficulties for purposes of his 7-hour deposition and it is unclear why an examination of a similar length would be too long.

Plaintiff also objects that the scope of the examination is too broad, and Defendants fail to provide sufficient information for determining the scope of the examination. As noted by the court in *Azevedo*, Rule 35 does not require the moving party to describe the particular testing procedures that will be used. Dr. Abrams' curriculum vitae and his educational background have been provided (Doc. 85-3), and he has indicated the types of testing he will perform in addition to his mental status evaluation (Doc. 85-3, ¶ 10).

Plaintiff cites *Marroni v. Matey*, 82 F.R.D. 371 (E.D. Penn. 1979) where the moving party failed to specify whether a medical doctor or a psychologist would evaluate the plaintiff's seizure disorder which the court found too unspecific for an examination order. *Marroni* is distinguishable. Here, Defendants have identified the psychiatrist they propose to conduct the examination, Dr. Abrams has provided a declaration regarding the information he needs to obtain and the types of testing he would perform during the examination, and Dr. Abrams' background and expertise is set forth in his curriculum vitae. This is a sufficient showing as to who will conduct the examination, the types of information sought, and the general manner of the examination. Defendants have provided much more information than was before the court in *Marroni*, where not even the type of medical professional – medical or mental health physician – was identified by the moving party.

Like his deposition, Plaintiff's mental examination by Dr. Abrams shall be limited to 7 hours. The examination may be continued at any time upon recommendation of Plaintiff's physician at Golden Cross.

**4.     Counsel's Presence at Examination**

The examination shall be videotaped at Defendants' expense, if requested by Plaintiff's counsel. Counsel shall not be present at the examination.

Rule 35 is silent as to who may attend a mental examination, and Plaintiff presents no authority that a party has an absolute right to have an attorney present. *See Holland v. United States*, 182 F.R.D. 493, 495 (D.S.C. 1998) ("The weight of federal authority, however, favors the

exclusion of the plaintiff's attorney from a Rule 35 examination absent a compelling reason."). As noted by several courts, a Rule 35 examination should be divested as far as possible of any adversary character, and the presence of an attorney at the examination injects a partisan element into what should otherwise be an objective medical inquiry. *McDaniel v. Toledo, Peoria & Western R.R. Co.*, 97 F.R.D. 525, 526 (C.D. Ill. 1983). Further, "by attending the medical examination, the attorney may be placing himself in the position of having to choose between participating in the trial as the litigator or as a witness." *Wheat v. Biesecker*, 125 F.R.D. 479, 480 (N.D. Ind. 1989). All objections to the admissibility of Plaintiff's examination statements will be preserved, however, even though the objection will not be made contemporaneously with the examination statements.

The parties may stipulate to a confidentiality agreement or move for a protective order regarding the information garnered at the mental examination if necessary to protect Plaintiff's privacy interests.

### IV. CONCLUSION AND ORDER

1. Defendants' Motion for a Rule 35 Mental Examination of Plaintiff is GRANTED;
2. The Rule 35 Mental Examination shall be conducted pursuant to Defendants' proposal set forth above, but will be limited to 7 hours and subject to continuation as determined by Plaintiff's physician at Golden Cross; and
3. The parties are to discuss and stipulate whether the examination shall be videotaped, but counsel shall not be present for the examination.

IT IS SO ORDERED.

Dated: **November 24, 2015**              **/s/ Sheila K. Oberto**
                                                                  UNITED STATES MAGISTRATE JUDGE